IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

GUADALUPE GARCIA-ROSALES,

        Defendant.

CR-05-402-MO

OPINION AND ORDER

**MOSMAN, J.**

    The matter before the court is defendant's Motion to Suppress evidence (Doc. # 14) obtained during a search of his residence on August 23, 2005, and statements he made during an interview conducted at his work place shortly after the search. The government avers that defendant's wife (Ms. Ruelas-Ceja) consented to the search of their shared residence. Ms. Ruelas-Ceja's testimony is not available because she invoked her Fifth Amendment privilege against self-incrimination. According to defendant, the government wrongly declined to grant immunity to Ms. Ruelas-Ceja. But even without her testimony, defendant contends the government has not met its burden of showing Ms. Ruelas-Ceja voluntarily consented to the search because she was unlawfully detained pursuant to the execution of an automobile seizure warrant at the time. He also argues the automobile seizure warrant was not supported by probable cause because the underlying affidavit contained material misstatements and omissions.

    The court conducted an evidentiary hearing on January 17 and 19, 2006. For the reasons that follow, defendant's motion to suppress is GRANTED.

## FACTS

On Monday, August 22, 2005, Special Agent David Tyree of the Drug Enforcement Agency (DEA), obtained three federal seizure warrants for three vehicles purchased by defendant. The next day Portland Police Bureau (PPB) Officer Bates stopped one of these vehicles, a 2005 GMC Yukon, driven by defendant's wife, approximately one mile from defendant's home. Tr. 28.[1] He was wearing a bullet-proof vest that said "police" on the front and he was armed, though he did not remove his gun from the holster. Tr. 15-16. The driver, Ms. Ruelas-Ceja, is a native speaker of Spanish and does not speak English fluently. Tr. 202. DEA Agent Gutensohn arrived shortly after the stop, wearing plainclothes and carrying a gun in his holster. Tr. 17, 42-43. He read the federal seizure warrant out loud to Ms. Ruelas-Ceja in English, but she said she did not understand. Tr. 18, 32. Accordingly, Agent Gutensohn radioed for an interpreter. Tr. 18. Ms. Ruelas-Ceja was not told she was free to leave. Tr. 51. Officer Bates testified that he believes he took the keys out of the Yukon. Tr. 33. Ms. Ruelas-Ceja waited by the side of the road while Officer Bates conducted a search of the Yukon with a narcotics-detection dog. Tr. 31. After that, Officer Bates invited Ms. Ruelas-Ceja to wait in the backseat of her car. Tr. 20.

Approximately one hour after the stop, DEA Agents Tyree and Poe, and United States Marshal (USM) Ortmann arrived. Agent Tyree testified that he speaks Spanish, though he is not able to understand when Spanish is spoken quickly. Tr. 51, 162, 171. When he approached her he displayed his DEA badge and credentials, and identified himself in Spanish as a police officer. Tr. 64, 150. Agent Tyree testified that he immediately explained to Ms. Ruelas-Ceja

---

[1] All transcript references are to the rough draft transcript on file with the court.

that he was investigating her husband (defendant) for drug trafficking.  Tr. 64, 152.  He did not

translate the seizure warrant for her or explain why she had been stopped.  Tr. 152.  Agent Tyree

testified that at some point he told Ms. Ruelas-Ceja she "hadn't done anything wrong" and she

"didn't have any charges."  Tr. 65.  But he did not tell her she was free to leave.  Tr. 150.

According to Agent Tyree, Ms. Ruelas-Ceja indicated that her husband was not a drug dealer.

Tr. 64.  He then presented her with a consent-to-search form, and said he would like to search her

house for "cuetes" and "drogas."  Tr. 65, 152-53.  "Cuete" is a Spanish slang term for gun, or

"piece," but it can also mean firecracker.  Tr. 70, 210.  "Drogas" is the Spanish word for drugs.

Ms. Ruelas-Ceja said these things would not be found at her house.  Tr. 153-54.  She then asked

if Agent Tyree had spoken with her husband.  Tr. 65, 154.  Agent Tyree said he would be

speaking with her husband shortly, but she could consent to the search, and he again presented

her with the consent-to-search form.  Id.  Agent Tyree testified that Ms. Ruelas-Ceja again

refused to sign the form and asked him to speak to her husband about searching the house.  Tr.

65, 69, 157.  Agent Tyree testified his response was, "I believe your husband is at work right

now and in the future we or other agents will have an interview with your husband."  Tr. 155-56.

Her sister testified that Ms. Ruelas-Ceja told her Agent Tyree said he had already spoken to her

husband.  Tr. 203.  Although he could not remember the words she used, Agent Tyree testified

that Ms. Ruelas-Ceja then gave clear verbal consent to the search.  Tr. 160.

 Ms. Ruelas-Ceja rode in the front passenger seat of her Yukon while Agent Tyree drove

the car to her house.  Tr. 162.  In transit, apparently out of concern for officer safety, Agent Tyree

again asked Ms. Ruelas-Ceja whether he would find dogs or "pistolas," the Spanish term for

pistols, in her house.  Tr. 70, 163.  He testified that she replied, "Oh, there is a gun in the closet."

Tr. 70, 163.  She also indicated that two small dogs were in the backyard.  Tr. 70.

Agent Tyree used Ms. Ruelas-Ceja's key to open the front door.  Tr. 71, 164.  While

the search was getting started, Ms. Ruelas-Ceja's sister arrived at the house.  Tr. 71, 165.  She

was permitted to sit with Ms. Ruelas-Ceja on the couch.  During the course of the search,

Ms. Ruelas-Ceja became "visibly angry" that agents were searching through paperwork in the

house.  Tr. 202.  She began arguing with Agent Tyree about whether he told her he was going to

search for papers.  Tr. 74, 168, 202.  Agent Tyree then told Ms. Ruelas-Ceja, for the first time,

that she could revoke consent by saying "stop searching."  Tr. 74, 163.  Agent Tyree testified that

Ms. Ruelas-Ceja then either asked Agent Tyree to "stop bothering her," or told him, "I want you

to stop."  Tr. 74, 168-69.  He then called off the search.  Tr. 168.

After searching the residence, Agents Tyree, Gutensohn and Ortmann, PPB Officer Glass,

and Immigration and Customs Enforcement (ICE) Agent Guy Gino, went directly to the bakery

where defendant worked.  Tr. 78.  They showed him a photograph and asked, "Are you this

person?"  Tr. 80.  Defendant agreed that he was, and wrote his name and social security number

on the photograph.  Tr. 86.  At some point he also told Agent Tyree he was an illegal alien.

Tr. 87.  Agent Tyree read him <u>Miranda</u> warnings in Spanish.  Tr. 81.  Agent Tyree then told

defendant agents had just searched his house and found firearms.  Tr. 87.  According to Agent

Tyree, defendant expressed concern for his wife's well-being, and asked, "Did you find all the

guns?"  Tr. 88.  Agent Tyree asked how many there were.  <u>Id.</u>  He then told defendant he was

conducting a narcotics investigation and he needed defendant's help.  Tr. 89.  He told defendant

he would be deported or prosecuted for possessing guns if he didn't cooperate.  Tr. 90.

Defendant indicated to Agent Tyree that he would prefer to discuss that topic away from his workplace. Tr. 90, 188. So agents drove defendant to a nearby industrial parking lot. Tr. 91. In the car Agent Tyree told defendant he was not under arrest, he did not have to speak to the agents, and he was free to leave. Tr. 85-86, 178. Defendant asked whether agents were going to beat him "like they do in Mexico." Tr. 92. Agent Tyree perceived this to be a joke, and interpreted defendant's demeanor as increasingly confident. Id. Agent Tyree told defendant he was aware of the unexplained cash transactions in his bank account. Tr. 93-94. Defendant said he did favors for his brother-in-law, Arnulfo Ruelas-Ceja, but that he did not know what his brother-in-law did for a living. Tr. 95. Ultimately, defendant agreed to consider cooperating with agents. Tr. 98. Agent Tyree asked if he could follow defendant to his residence to retrieve the other guns. Tr. 99. According to Agent Tyree, defendant replied, "Yes, no problem." Id. Agents found two more firearms and ammunition at that time, which they also seized. Tr. 103.

## DISCUSSION

### I.    Immunity

According to defendant, all evidence obtained as a result of Ms. Ruelas-Ceja's alleged consent to a search of his residence on August 23, 2005, must be suppressed because the government refused to grant immunity to Ms. Ruelas-Ceja, a material witness, after she invoked her Fifth Amendment privilege. The government contends it properly exercised its discretion not to grant her immunity. I find defendant has not made a prima facie showing of prosecutorial misconduct sufficient to justify an evidentiary hearing on this matter under the Lord/Westerdahl test.

It is well established in the Ninth Circuit that the government may not be compelled to seek a grant of immunity for a prospective defense witness. United States v. Westerdahl, 945 F.2d 1083 (9th Cir. 1991); United States v. Shirley, 884 F.2d 1130 (9th Cir. 1989); United States v. Trejo-Zambrano, 582 F.2d 460 (9th Cir. 1978); United States v. Alessio, 528 F.2d 1079, 1081 (9th Cir. 1976); United States v. Bautista, 509 F.2d 675, 677 (9th Cir. 1975); Cerda v. United States, 488 F.2d 720 (9th Cir. 1973); United States v. Jenkins, 470 F.2d 1061 (9th Cir. 1972). The government's discretion to grant immunity to a witness is rooted in the Executive Branch's constitutional duty to take care that the laws of the United States be faithfully executed, U.S. Const. art. II, § 3, as interpreted and codified by Congress at 18 U.S.C. § 6002 et. sec. This statute provides that the United States Attorney may ask the court to grant immunity to a witness when "the testimony or other information from such individual may be necessary to the public interest." 18 U.S.C. § 6003(b)(1). Absent the government's request, the court alone has no authority to grant immunity to a potential witness, nor to compel the government to request a grant of immunity. See United States v. Richardson, 588 F.2d 1235, 1241 (9th Cir. 1978); but see Virgin Islands v. Smith, 615 F.2d 964, 969-70 (3d Cir. 1980)(opining that the court has inherent authority to confer immunity upon a defense witness when necessary to effectuate defendant's right to compulsory process).

Still, the government's prosecutorial powers may not be exercised in a manner that impinges upon the defendant's right to due process of law. See Earl v. United States, 361 F.2d 531, 534 n.1 (D.C. Cir. 1966)(hypothesizing that a defendant might be denied due process if the government uses its authority to seek immunity for its own witnesses, but declines to do so on behalf of the defendant). Thus, when the government refuses to seek immunity for a defense

witness, the defendant is entitled to an evidentiary hearing to safeguard his right to a fair trial if

he makes a prima facie showing of prosecutorial misconduct.  See Westerdahl, 945 F.2d at 1086

(citing United States v. Lord, 711 F.2d 887, 891 (9th Cir. 1983), and Jeffers v. Ricketts, 832 F.2d

476, 479 (9th Cir. 1987), rev'd on other grounds sub nom. Lewis v. Jeffers, 497 U.S. 764 (1990)).

To make a prima facie showing of prosecutorial misconduct, a defendant must show that:  (1) the

witness' testimony is relevant; and, (2) "the government distorted the judicial fact-finding process

by denying immunity to the potential witness."  Westerdahl, 945 F.2d at 1086.

The court in Westerdahl found the testimony of a defense witness who would directly

refute a government witness' assertion that he saw the defendant commit a robbery clearly

satisfied the relevancy prong of the Lord test.  Id.  In noting that "misconduct is not confined

solely to situations in which the government affirmatively induces a witness not to testify in

favor of a defendant," the court found the second prong of the Lord test was also satisfied.  Id.

at 1087.  The court reasoned that because the government had granted use immunity to two of

its own witnesses, and a third witness had testified pursuant to a plea agreement (suspending

prosecution of a host of felony charges), but then refused to grant immunity to the defense

witness who would refute one or more of these witnesses' testimony, it may have distorted the

fact-finding process.  Id. at 1087.

Similarly, in Lord, the court determined that the defendant proved eyewitness testimony

might corroborate the defendant's entrapment defense that DEA agents harassed and threatened

him in order to induce him to sell drugs, satisfying the first prong of the test.  Lord, 711 F.2d at

891.  The eyewitness' contention that the prosecutor told him "whether he would be prosecuted

depended on his testimony," juxtaposed with the prosecutor's claim that he simply informed the

eyewitness of his privilege against self incrimination and told him the government wouldn't prosecute him if he submitted to an interview and testified truthfully, would be enough to satisfy the second prong. Id. The court reasoned that both versions "could suggest distortion of the judicial fact-finding process." Id. Thus, the court remanded the case for the district court to hold an evidentiary hearing.

Conversely, in Jeffers, although the testimony of a drug-dealer who sold the victim heroin the week of his death was relevant, satisfying the first prong of the Lord test, the defendant failed to proffer any evidence of prosecutorial misconduct to meet the second prong. 832 F.2d at 479. The court observed, "[t]here is no suggestion that the prosecutor made any threat to [the material witness] that induced him to invoke the fifth amendment . . . [n]or is there any showing that the prosecution presented a distorted factual picture by immunizing its witnesses to testify to one side of a story while denying immunity to defense witnesses who would present the other side." Id.; cf. Alessio, 528 F.2d at 1080 (surmising that a defendant might be denied due process if the government grants immunity to its own witnesses but declines to grant it to defendant's).

In the case at bar, Ms. Ruelas-Ceja's testimony is clearly relevant because she is the person who allegedly consented to the search of defendant's residence where the incriminating evidence was found. Thus, defendant has satisfied the first prong of the Lord test. As to the second prong, defendant argues that by "raising the possibility that [she] would be prosecuted based on her testimony at the hearing, the government set in motion a predictable chain of events that resulted in Ms. Ruelas-Ceja invoking her Fifth Amendment right and declining to testify." Def.'s Post-Hearing Memo. at 3-4. Yet, unlike in Lord, defendant concedes that the government did not have direct contact with Ms. Ruelas-Ceja or threaten to prosecute her to get her to invoke

the Fifth Amendment. Rather, cognizant of the delicacy of Ms. Ruelas-Ceja's relationship with defendant, the government expressed concern that Ms. Ruelas-Ceja should seek independent legal counsel before testifying. There was an obvious and solid foundation for this suggestion, based on her status as an illegal alien and the risk that she might inculpate herself with respect to the guns found at the residence. Tr. 171. Accordingly, I appointed an attorney to represent her. After being apprised of the issues in this case, Ms. Ruelas-Ceja's attorney advised her to invoke her Fifth Amendment privilege, and the government declined her attorney's request for immunity. But unlike in Westerdahl, here the government did not rely on the testimony of immunized witnesses while refusing to immunize defense witnesses.

Furthermore, similar to the defendant in Jeffers, the defendant here does not even contend that the government has presented a distorted factual picture of the events surrounding Ms. Ruelas-Cejas' alleged consent to search defendant's residence. To the contrary, the defendant himself admits that Ms. Ruelas-Ceja's statement to defense Investigator Bates on October 13, 2005, closely parallels the DEA agent's version of the encounter on August 23, 2005. Def.'s Ex. 102; Doc. 27 at 10. In support of his argument that Ms. Ruelas-Cejas' proffered statement should be considered for the truth of the matters it asserts, defendant argues that "[t]he significant differences between Ms. Ruelas-Ceja's recollection of the events and [DEA] Agent Tyree's recollection can be attributed primarily to miscommunications and the subjective experiences of the parties involved." Id.

I agree, and therefore conclude that defendant fails to satisfy the second prong of the Lord test, and thus fails to make a prima facie showing of prosecutorial misconduct. Accordingly, this

court will inquire no further into the government's choice not to offer immunity to Ms. Ruelas-Ceja.

## II.     Validity of Warrant

Defendant asserts that Agent Tyree's affidavit in support of the seizure warrant was so lacking in probable cause that no reasonable officer could have relied on it. Specifically, he contends the affidavit contained material misstatements regarding the significance of telephonic contacts between defendant's number and numbers connected to DEA investigations, and material omissions about the reliability of the Narcotics and Dangerous Drugs Information System (NADDIS). Defendant argues that if this information had been included in the affidavit, the affidavit could not have supported a finding of probable cause to believe defendant's unexplained wealth was derived from the sale of narcotics. The government contends the warrant was supported by probable cause, and that Agent Tyree relied on the warrant in good faith under United States v. Leon, 468 U.S. 897, 916 (1984).

The relevant paragraphs of the affidavit state:

22.  I know from training and experience that law enforcement uses telephone tolls (detailed billing information, retained by telephone companies for a specific telephone number) to identify conspirators, create frequency reports and flow charts which demonstrate contact with coconspirators and may also demonstrate the scope and magnitude of a drug trafficking organization and other relevant information that would demonstrate a "drug nexus."

23.  In the course of this investigation, I obtained telephone tolls and subscriber information for telephone number 503-816-9504. Telephone number 503-816-9504 is subscribed to by Guadalupe GARCIA with a billing address of 10504 SE Pardee Street, Portland, Oregon. GARCIA'S Social Security Number is listed as *** ** 3653. GARCIA'S home and business telephone number is listed as 503-761-8644. Analysis of telephone tolls from GARCIA'S telephone from March 1, 2005 through May 27, 2005 reflected that the telephone number had a total of 86 telephonic contacts with three different telephone numbers identified in no less than ten (10) investigations which have

been conducted by the Drug Enforcement Administration. Of those three numbers identified in GARCIA'S tolls, the second most frequently called telephone number by GARCIA'S phone is subscribed to by Arnulfo RUELAS-CEJA. Analysis of the telephone used by Arnulfo RUELAS-CEJA reflected that RUELAS-CEJA'S telephone has contact with telephone numbers identified in no less than fifteen (15) telephone numbers associated with and identified in [sic] investigations conducted by the Drug Enforcement Administration which involve the distribution of illegal narcotics.

Aff. in Supp. of Application at 10-11 (social security number redacted).

To put this issue in perspective, it bears noting that to obtain a civil forfeiture warrant under 21 U.S.C. § 881(a)(6), the authority used here, the government must show a substantial connection or "nexus" between the property to be forfeited and narcotics trafficking. See, e.g., United States v. One 1986 Ford Pickup, CA License No. 2W03753, VIN 2FTJW36L6GCA99688, 56 F.3d 1181, 1188 (9th Cir. 1995); United States v. $405,089.23 in U.S. Currency, 122 F.3d 1285, 1289 (9th Cir. 1997), appeal after remand, 191 F.3d 461 (9th Cir. 1999). Although the government may rely on circumstantial evidence and hearsay to establish this connection, conclusory statements about a claimant's criminal acquaintances will not suffice. United States v. $191,910.00 in U.S. Currency, 788 F. Supp. 1090, 1097 (N.D. Cal. 1992). Large sums of currency unaccounted for by a claimant's legitimate income may be "strong evidence" of narcotics trafficking, but currency alone is insufficient to establish probable cause under 21 U.S.C. § 881(a)(6). Id. at 1095. The government must proffer some evidence connecting the large sums of money to narcotics. Id.

Although defendant did not request a Franks hearing, he argues that under Franks v. Delaware, 438 U.S. 154, 164-65 (1978), the warrant was invalid. In Franks, the Supreme Court held that intentionally or recklessly submitting false statements in a warrant affidavit violates the Fourth Amendment. 438 U.S. at 155. A defendant is entitled to a Franks hearing if he makes "a

substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." Id. at 155-56. To meet his burden, the defendant "should point out specifically the portion of the warrant affidavit that is claimed to be false" and submit a statement of supporting reasons. Id. at 171. "Allegations of negligence or innocent mistake" will not suffice. Id. If perjury or reckless disregard for the truth is established by a preponderance of the evidence, the court must set the "false" material aside and determine whether the "remaining content is [ ]sufficient to establish probable cause." Id. at 156. If not, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." Id.

A similar analysis is used for allegations of material omissions in United States v. Pace, 898 F.2d 1218, 1232 (7th Cir. 1990). In Pace, the Seventh Circuit considered whether the lower court erred by refusing to hold a Franks hearing based on defendant's contention that a material omission in the supporting affidavit rendered a warrant invalid. Id. The court found that "[t]he rule of [Franks,] prohibiting a police officer from deliberately or recklessly presenting false material information in a warrant application, also prohibits the officer from deliberately or recklessly omitting material information from the application." Id. Defendant argued that the affidavit in support of a warrant to search his residence omitted information that a search of his friend's residence, subsequent to an informant's tip that defendant had entered with a suspicious bag of white powder, did not turn up any drugs. Id. at 1233. Defendant also alleged that the officer who authored the affidavit did not know the name of the informant, or whether he was reliable. Id. at 1234. The Seventh Circuit held that the lower court did not err by declining to

hold a <u>Franks</u> hearing because (1) the search of the friend's house did uncover empty bags containing cocaine residue; and, (2) defendant was only speculating as to whether the affiant knew the name of the confidential informant, so his request was nothing more than "a mere desire to cross-examine." <u>Id.</u> at 1228; <u>see also</u> <u>Franks</u>, 438 U.S. at 171 (stating that "[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.").

In the case at bar, defendant relies on speculation and conclusions not supported by the record to argue that Agent Tyree intentionally or recklessly overstated the significance of telephonic contacts with numbers "identified in" DEA investigations, and omitted the fact that NADDIS data is unreliable and that the majority of the contacts were with defendant's family members.[2]  At the suppression hearing, defendant had an opportunity to question Agent Tyree about these matters.  Tr. 108-39, 181-83, 188-95.

Agent Tyree testified that a "telephonic contact," as the term is used in paragraph 23 of the affidavit, was established when a number "identified in" a DEA investigation contacted defendant's phone, or when defendant's phone called such a number, regardless of whether a conversation was held.  Tr. 121.  A number is "identified in" a DEA investigation, if it is registered in NADDIS.  Tr. 122.

Agent Tyree had some information regarding the nature of the investigation each number was identified in, and intimate knowledge of the investigation in which one of the numbers was identified.  Tr. 122.  Agent Tyree conceded that the registrants of numbers identified in a DEA

---

[2] Defendant avers that only 12 out of the 86 contacts were with non-family members.

investigation have not necessarily been convicted of a crime. Tr. 123. However, for a number

to be entered into the NADDIS database, "[i]t goes through an intelligence analyst," who has

certain criteria for adding a number to the database, with which Agent Tyree was not familiar.

Id. Agent Tyree agreed that simply by calling defendant, whose number is now identified in a

DEA investigation, defense counsel would have a telephonic contact with a number identified in

a DEA investigation. Tr. 125.

Agent Tyree testified that he was not aware at the time he authored the affidavit that one

of defendant's telephonic contacts was with a number registered to his brother-in-law, Arnulfo

Ruelas-Ceja, and another was registered to his sister-in-law, Maria Figueroa de Garcia. Tr. 127,

133. He testified that he "didn't check" and "didn't know" of these family connections, and that

he is not aware of any way he could have checked. Tr. 135, 183.

Based on this record, I find defendant has failed to make a substantial preliminary

showing that Agent Tyree made a false statement or omission knowingly and intentionally, or

with reckless disregard for the truth, in the warrant affidavit.

I do not accept defendant's assertion that Agent Tyree overstated the significance of

defendant's contacts with numbers in the NADDIS database, much less that he did so

intentionally or with reckless disregard for the truth. In his affidavit Agent Tyree wrote that

defendant's number had telephonic contacts with numbers "identified in investigations conducted

by the Drug Enforcement Administration which involve the distribution of illegal narcotics." His

testimony supports this assertion completely. He did not state in the affidavit that defendant had

"telephonic contact between documented drug traffickers," as defendant asserts. Doc. 27 at 21.

Further, even if Agent Tyree had included in the affidavit the substance of his testimony about

how a "telephonic contact" with a number "identified in" a DEA investigation is established, I believe it would still support a finding of probable cause.

Defendant also fails to point to any evidence that Agent Tyree intentionally or recklessly overstated the reliability of NADDIS data. In fact Agent Tyree made no comment regarding the reliability of NADDIS. He only described it as a tracking system that is used "to identify conspirators, create frequency reports and flow charts which demonstrate contact with coconspirators and may also demonstrate the scope and magnitude of a drug trafficking organization and other relevant information that would demonstrate a 'drug nexus.'" Defendant cites two cases containing dicta questioning the reliability of NADDIS. United States v. $242,484.00 in U.S. Currency, 351 F.3d 499, 506 n.10 (11th Cir.), rev'd on other grounds, 389 F.3d 1149 (2004); United States v. $7,850.00 in U.S. Currency, 7 F.3d 1355, 1358 (8th Cir. 1993). But these cases are unavailing because they do not find that NADDIS data should not be relied on in warrant applications, nor do they have any bearing on Agent Tyree's state of mind.

Defendant has also failed to show that Agent Tyree knew or should have known that some of the telephonic contacts were with defendant's family members. I also find that even if this information had been included in the affidavit it would not subtract from the probable cause calculus whatsoever since narcotics traffickers often work with family members.

In sum, defendant had ample opportunity to develop evidence of Agent Tyree's alleged knowing and reckless conduct and he failed to do so. Accordingly, defendant is not entitled to a Franks hearing, much less to the ultimate remedy for an established Franks violation.

### III.    Consent

The government bears the burden of showing that Ms. Ruelas-Ceja's alleged consent was voluntary.  United States v. Patayan Soriano, 361 F.3d 494, 501 (9th Cir. 2004).  Voluntariness is determined from the totality of the circumstances.  Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  However, the Ninth Circuit has identified five non-inclusive factors to be used as "guideposts" in the voluntariness inquiry.  United States v. Rodriquez-Preciado, 399 F.3d 1118, 1126 (9th Cir. 2005).  These guideposts include:  "(1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained."  Id.; see also United States v. Jones, 286 F.3d 1146, 1152 (9th Cir. 2002).

In Rodriquez-Preciado, the Ninth Circuit affirmed the district court's denial of defendant's motion to suppress drugs found in his motel room, which was searched allegedly with defendant's roommate's consent.  399 F.3d at 1126.  The court reasoned that the roommate was not in custody at the time he consented, so Miranda warnings were not necessary.  Id.  The officers did not draw their weapons, they asked for permission to search in Spanish and the roommate responded "si" and motioned the officers into the room.  Id.  Although the roommate was not advised that he could withhold consent or told that a warrant could be obtained, "[i]t is not necessary to check off all five factors."  Id.

In this case, unlike in Rodriquez-Preciado, many of the guidepost factors were present, in addition to other salient factors, that lead me to find that under the totality of the circumstances the government has not shown Ms. Ruelas-Ceja voluntarily consented to the search.

## A.    Custody

Under Berkemer v. McCarty, 468 U.S. 420, 440 (1984), ordinary traffic stops are not custodial for two reasons. First, detention of a motorist pursuant to a traffic stop is "presumptively temporary and brief." Id. at 437 (noting that "the vast majority of roadside detentions last only a few minutes"). Second, "the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in Miranda . . . ." Id. at 438-39 (noting that a typical traffic stop is public, and involves "only one or at most two policemen"). For these reasons, the ordinary traffic stop is more analogous to a Terry stop than a formal arrest. Id. at 439.

The court in Berkemer found the defendant was not in custody prior to being placed under arrest for drunk driving because only a short time had elapsed between the stop and arrest by a single officer who asked only a modest number of questions. Id. at 441-42. However, the court noted that a traffic stop could lose its non-custodial character by exceeding "the bounds set by the Fourth Amendment on the scope of a Terry stop," at which point the detainee would be entitled to the "full panoply of protections prescribed by Miranda." Id. at 439 n. 29, 440 (citing Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

In the instant case, the government does not contend the stop of Ms. Ruelas-Ceja's automobile was a Terry stop because officers lacked reasonable suspicion that she was herself involved in unlawful activities. In any event, both the scope and the purpose of a Terry stop were exceeded here. Terry, 392 U.S. at 30. Defendant contends that the bounds of an ordinary traffic stop under Berkemer were also exceeded because the stop *was not* temporary and brief – it lasted over an hour – and it *was* police dominated as two officers originally stopped her, three more

arrived, one wore a bullet-proof vest bearing the word "POLICE," they all had weapons in holsters, and they had a narcotics-detection dog. I concur.

The government contends the residential search line of cases is better suited to the facts of this case. It avers that although Ms. Ruelas-Ceja was in her car at the time the seizure warrant was executed, the stop was more analogous to the execution of a residential search warrant under Michigan v. Summers, 452 U.S. 692, 702 (1981). In Summers, the Court held that a warrant to search a residence for contraband "implicitly carries with it the limited authority to detain the occupants at the premises while a proper search is conducted." 452 U.S. at 705. The court found that the detention of a person in his residence, "although admittedly a significant restraint on his liberty . . . could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." Id. at 701-02. The court reasoned that most people "would elect to remain in order to observe the search of their possessions," and that this type of detention "is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." Id. at 702. Similarly, in this case the government contends Ms. Ruelas-Ceja remained with her car because she wanted to find out what would happen to it.

In a recent decision the parties do not reference, the Supreme Court held that the government did not violate Summers by detaining for up to three hours the occupants of a residence searched pursuant to a warrant that authorized a search for weapons and evidence of gang-membership. Muehler v. Mena, 544 U.S. 93, __, 125 S.Ct. 1465, 1470 (2005). A SWAT team was used to secure the residence before the search began because officers had reason to

believe people involved in a gang-related drive-by shooting resided at the house and were armed and dangerous.  Id. at 1468.  The occupants were handcuffed and held in a garage during the search, and an Immigration and Naturalization Services (INS) officer questioned them for their names, dates of birth, place of birth, and immigration status.  Id.  The court held that this questioning was permissible under Summers because it did not prolong the occupants detention, and it was based on reasonable suspicion that the occupants were illegal aliens.  Id. at 1470.

Here, unlike in Summers and Muehler, officers had an automobile seizure warrant, not a residential search warrant.  Although an inventory search is probably anticipated by a seizure warrant, this one did not specify that weapons would be found in the automobile or that the driver may be dangerous.  Officer Bates testified that he wore a bullet-proof vest as a matter of routine, but he did not draw his weapon or frisk or handcuff Ms. Ruelas-Ceja, or even suspect her of being armed or dangerous.  Tr. 15-16.  Although a brief detention of the occupants of an automobile is clearly necessary to effectuate an automobile seizure warrant, in this case Agent Tyree's questioning prolonged the detention of Ms. Ruelas-Ceja far longer than needed to translate the warrant and remove her personal possessions from the car.  This finding is particularly salient because Agent Tyree never translated the warrant or explained the purpose of the stop to Ms. Ruelas-Ceja.  The very purpose of his questioning was to gain more information from Ms. Ruelas-Ceja than he could gain through the search and seizure of her automobile.  In other words, the stop was "unduly prolonged in order to gain more information."  Summers, 452 U.S. at 701.  Accordingly, I find that Agent Tyree exceeded his authority under Summers and Muehler, sufficient to cause Ms. Ruelas-Ceja to be unlawfully detained, or "in custody," at the time he began questioning her, if not before.

## B.      Miranda Warnings

Ms. Ruelas-Ceja was never given <u>Miranda</u> warnings because officers did not consider her to be in custody.  However, since I find that she was unlawfully detained, or in custody for purposes of <u>Miranda</u>, that she was not warned of her right to remain silent weighs in favor of involuntariness.

## C.      Language Barrier & Right to Refuse Consent

Although Ms. Ruelas-Ceja did not testify at the suppression hearing, it is clear from the testimony of Officer Bates, Agents Gutensohn and Tyree, Judith Ruelas-Ceja de Garcia, and from the assistance of the court interpreter, that Ms. Ruelas-Ceja is not fluent in English and Agent Tyree is not fluent in Spanish.  This is of particular importance to my ruling because I believe it prevented Agent Tyree and Ms. Ruelas-Ceja from ever truly reaching a meeting of the minds regarding consent to search.  I credit Agent Tyree's testimony that he believed that Ms. Ruelas-Ceja consented to the search.  However, the totality of the circumstances surrounding her alleged consent leads me to find that he was mistaken, and that Ms. Ruelas-Ceja did not believe she had the authority to prevent the search from taking place.  At a minimum, the government has failed to meet its burden of showing voluntariness.

First, the seizure warrant Officer Bates showed Ms. Ruelas-Ceja could well have been misinterpreted by her.  Since Agent Tyree did not translate it for her, or even explain the purpose of the stop, Ms. Ruelas-Ceja may have believed that the warrant authorized the search of her residence.  Although there is no suggestion in the record that Agent Tyree said he could get a warrant even if she refused consent, Ms. Ruelas-Ceja may have believed he already had one.

Second, it appears Ms. Ruelas-Ceja may not have understood the term "cuetes" Agent

Tyree originally employed when asking if there were guns in her house. She may have misunderstood him to ask whether there were fireworks in her house, which would not be unreasonable since some fireworks are not lawful to possess in this country. This conclusion is bolstered by Ms. Ruelas-Ceja's reaction when, en route to her residence after she allegedly consented to the search, Agent Tryee used the word "pistolas" instead of "cuetes." Ms. Ruelas-Ceja responded, "Oh, yes, there is a gun in the closet."[3] Her response suggests that even if all other factors supported a finding of voluntariness, Ms. Ruelas-Ceja did not understand what she was consenting to when she allegedly gave consent to search for "cuetes" and "drogas."

Third, the evidence strongly suggests that Ms. Ruelas-Ceja may have been under the misapprehension that her husband had authorized the search. When Agent Tyree presented her with a consent form she immediately asked if he had spoken to her husband. He testified that his approximate response was, "I believe your husband is at work right now and in the future we or other agents will have an interview with your husband." Tr. 155-56. This answer did not address Ms. Ruelas-Ceja's question as to whether he had already spoken to him at an earlier time about searching the residence. Ms. Ruelas-Ceja then asked Agent Tyree if he could just deal with her husband regarding the search. Agent Tyree responded that he was dealing with her and that she could consent, even if she didn't want to sign anything. Yet, the confusion about what role Ms. Ruelas-Ceja believed her husband played in the search was never clarified to her. This point is illustrated by the testimony of her sister, Judith Ruelas-Ceja de Garcia. She testified that

---

[3] The word "gun" in this context is Agent Tyree's English translation of what Ms. Ruelas-Ceja said in Spanish. Since he also testified there is no Spanish word for gun, it seems likely she actually used the word "pistola."

Ms. Ruelas-Ceja told her, while the search was underway, that Agent Tyree said he had spoken to her husband and she had asked him to wait until her husband got home. Tr. 203. I find Ms. Ruelas-Ceja de Garcia's testimony credible on this point, particularly as it reflects on Ms. Ruelas-Ceja's state of mind at the time of consent.

Fourth, I credit Ms. Ruelas-Ceja de Garcia's testimony that Agent Tyree's poor Spanish made an already confusing situation worse because in addition to employing slang terminology he sometimes used the wrong word altogether. Ms. Ruelas-Ceja de Garcia testified, for example, that when Agent Tyree "talked about the point he was talking about, he talked about the bridge." Tr. 202. The word for point in Spanish is "punto" and the word for bridge is "puente." Furthermore, Agent Tyree testified that when ICE Agent Guy Gino began speaking with Ms. Ruelas-Ceja quickly and loudly in Spanish, he did not understand them. Tr. 171-72. Thus, it is quite likely Agent Tyree did not understand everything Ms. Ruelas-Ceja said to him either.

Finally, Agent Tyree testified that he did not explicitly tell Ms. Ruelas-Ceja she had a right to refuse consent until she became angry that agents were going through her papers. At that point he told her she could stop the search just by saying "stop searching." Tr. 74, 163. Ms. Ruelas-Ceja immediately said, "I want you to stop." Tr. 74, 168-69. The government argues that Ms. Ruelas-Ceja must have believed she had consented if she thought she had the power to revoke consent. However, I find this fact just as strongly suggests that Ms. Ruelas-Ceja did not think she had the authority to stop the search until Agent Tyree told her she did.

In sum, I find the language barrier between Agent Tyree and Ms. Ruelas-Ceja prevented Ms. Ruelas-Ceja from voluntarily consenting to the search.

### D.    Consent Form

As mentioned, Agent Tyree twice presented Ms. Ruelas-Ceja with a consent form and both times she refused to sign it. Though by no means dispositive, this factor bolsters my finding that Ms. Ruelas-Ceja did not believe she had the power to prevent her home from being searched, nor that she alone was authorizing it.

In sum, many of the Rodriquez-Preciado factors tending to show consent is not voluntary were present here, including: (A) Ms. Ruelas-Ceja was in custody for purposes of Miranda at the time her consent was allegedly given; (B) she was not advised of her Miranda rights; (C) a language barrier prevented Ms. Ruelas-Ceja from understanding that she had the power to authorize or prevent the search; and, (D) she twice refused to sign a consent form. Accordingly, under the totality of the circumstances I find Ms. Ruelas-Ceja did not voluntarily consent to the search.

## IV.    Exclusionary Rule

Defendant contends all evidence derived from the search of his residence must be suppressed under the exclusionary rule. Wong Sun v. United States, 371 U.S. 471, 488 (1963). The relevant test under Wong Sun is whether "granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. (internal quotations and citation omitted). There are three exceptions to this exclusionary rule: "(1) the independent source exception; (2) the inevitable discovery exception; and (3) the attenuated basis exception." See United States v. Davis, 332 F.3d 1163, 1171 (9th Cir. 2003) (citing United States v. Smith, 155 F.3d 1051, 1060 (9th Cir. 1998)).

The government does not argue that any of these exceptions apply. To the contrary, it conceded that if the search of the house was unlawful, so too were any statements defendant made after he was told of the discovery of the guns during the first search, as well as the additional guns recovered after the interview. Tr. 228-29. In any event, I find that the attenuated basis exception is the only exception that could conceivably apply to save defendant's statements.

The inquiry under this exception is akin to a proximate causation analysis insofar as it looks to whether the relationship between the unlawful search or seizure and the challenged evidence is sufficiently weak to dissipate any taint resulting from the original illegality. Smith, 155 F.3d at 1060 ("In other words, at some point along the line, evidence might be 'fruit,' yet nonetheless be admissible because it is no longer 'tainted' or 'poisonous.'"). The line between "taint" and "attenuation" is not easily drawn. Id. "Whether derivative evidence is admitted or excluded 'will depend upon the precise role the illegal seizure in fact played in the subsequent discovery.'" Id. (quoting United States v. Bacall, 443 F.2d 1050, 1057 (9th Cir. 1971)).

The facts in this case do not support a finding of attenuation. To the contrary, the link between the search and defendant's statements is direct as it is highly unlikely defendant would have asked, "Did you find all the guns," if he had not been told agents had just seized guns from his house, or cooperated at all. Accordingly, I find defendant's statements on August 23, 2005, along with any evidence garnered from them, must be suppressed along with all evidence derived from the search of his residence.

## <u>CONCLUSION</u>

For the reasons given above, defendant's motion to suppress evidence and statements

(Doc. #14) is GRANTED.

IT IS SO ORDERED.

DATED this __27th__ day of February, 2006.


    __/s/ Michael W. Mosman_____
    MICHAEL W. MOSMAN
    United States District Judge